### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCIOLI TURCO, INC. and : | |
| 915 SPRING GARDEN ASSOCIATES, LP, : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 21-563 |
| PHILADELPHIA & READING RAILROAD : | |
| CO. and READING INTERNATIONAL, INC. : | |

### MEMORANDUM

**SURRICK, J.**                                                                 **November 14, 2023**

## I.   BACKGROUND

Through much of the 19th and 20th Century, Philadelphia & Reading Railroad Company, later the Reading Company, operated a railroad line known as the "9th Street Branch" along a viaduct through a station located at 901 Spring Garden Street in Philadelphia ("the Property"). ("Mot. to Remand," ECF No. 14, at 13–14, 24; "Defs' Resp.," ECF No. 16, at 14, 19.)[1] By the late 1960's, the railroad began to decline and it filed for bankruptcy in 1971.  *See In re Reading Co.*, 378 F. Supp. 474, 475–76 (E.D. Pa.).  In 1976, through federal legislation known as the 3R Act, 45 U.S.C. § 701 *et seq.*, Reading transferred to a new, Congressionally-created railroad, Conrail, an easement to operate on the 9th Street Branch. (Mot. to Remand at 14–15; Defs' Resp. at 12, 14–15.)  Conrail abandoned operations on the 9th Street Branch in 1983 and trains stopped running on the tracks shortly thereafter. (Mot. to Remand at 14; Defs' Resp. at 12–13, 15.)  The Southeastern Pennsylvania Transportation Authority ("SEPTA") maintained an easement in a

---

[1] All page numbers refer to ECF Pagination.

"traction power substation at Callowhill Street" and overhead transmission wires along the line until 2010, when it relinquished the easement. (Defs' Resp. at 17–18.)

In the 1980's, businessman James Cotter purchased the Reading Company's assets out of bankruptcy and formed Reading International, Inc. ("Reading"). ("Pls' Memo," ECF No. 15, at 9–10.) Today, Reading primarily owns and operates movie theaters in the United States, Australia, and New Zealand, while retaining "the fee interests in various parcels related to [its] historic railroad operations," including the 9th Street Branch. (ECF No. 29, at 97–100, 120.) The Property and the greater 9th Street Branch now sit in a state of significant disrepair. (*See* Pls' Memo at 6–7; ECF No. 23-2.)

Plaintiffs, Scioli Turco, Inc., and 915 Spring Garden Associates, LP, are, respectively, an economic development organization and the Property's immediate neighbor. (Pls' Memo at 6.) In an attempt to rehabilitate the Property, Plaintiffs filed an action against Reading under the Abandoned and Blighted Property Conservatorship Act, 68 Pa. Stat. § 1101 *et seq.* ("Act 135"), in the Court of Common Pleas of Philadelphia County to have Scioli Turco be appointed as conservator of the Property in order to rehabilitate it.[2] ("Pls' Compl.," ECF No. 12-1, at 2–3, 18–20, 53.) Reading removed the case to this Court ("Ntc. of Rem.," ECF No. 1) and filed a Motion to Dismiss ("Mot. to Dismiss," ECF No. 13). Plaintiffs thereafter filed a Motion to Remand the case to the Court of Common Pleas. (Mot. to Remand.) We denied Plaintiffs' Motion to Remand, holding that removal was proper based on diversity jurisdiction under 28 U.S.C. § 1332. ("Memo on Mot. to Remand," ECF No. 25, at 3.) Because both parties had

---

[2] Plaintiffs also listed as a defendant the Philadelphia & Reading Railroad Company. However, because Philadelphia & Reading Railroad Company is a now-extinct corporation that was absorbed by the Reading Company and later Reading International, Inc., we held that it was a nominal party to the case. (Memo on Mot. to Remand at 5–7.)

2

submitted materials outside of the pleadings in support of or in opposition to the Motion to Dismiss, we then ordered that Reading's Motion to Dismiss would be treated as a Motion for Summary Judgment under Fed. R. Civ. P. 56.  (ECF No. 27.)  Accordingly, we now address Reading's Converted Motion to Dismiss.

**II.     LEGAL STANDARD**

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

**III.    DISCUSSION**

Reading argues that Plaintiffs' action under Act 135 is "completely" and "ordinarily" preempted by 49 U.S.C. § 10501(b) ("Section 10501(b)").  (Mot. to Dismiss at 10.)  The complete preemption doctrine operates to allow a federal court to exercise federal question jurisdiction under 28 U.S.C. § 1331 over an ostensibly state law cause of action, such as Plaintiffs' claim under Act 135.  *See Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 6–8 (2003).  However, because we held that we have diversity jurisdiction over this case under 28 U.S.C. § 1332, we need not address Reading's complete preemption argument.  (*See* Memo on Mot. to Rem. at 3.)  The only question that we need now address is whether Plaintiffs' Act 135 suit is "ordinarily" preempted by Section 10501(b) pursuant to the Supremacy Clause, U.S. Const. art.

3

VI, cl. 2. *See Arizona v. United States*, 567 U.S. 387, 399 (2012) (under the Supremacy Clause, "Congress has the power to preempt state law" and "withdraw specified powers from States by enacting a statute containing an express preemption provision").

### A. Plaintiffs' Act 135 Action is Preempted

When it enacted the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10101, *et seq.*, Congress abolished the Interstate Commerce Commission ("ICC") and transferred its remaining regulatory authority to the newly-created Surface Transportation Board ("STB"). *Bhd. of R.R. Signalmen v. Surface Transp. Bd.*, 638 F.3d 807, 809 n.1 (D.C. Cir. 2011). As part of that act, Section 10501(b) provides that the STB has exclusive jurisdiction over the following:

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, *abandonment*, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.

49 U.S.C. § 10501(b) (emphasis added). It further provides that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.*

"[Section] 10501(b) applies to three types of state statutes, regulations, and judicial remedies." *City of Ozark, Arkansas v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1171 (8th Cir. 2016). First, it preempts "any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations." *Id.* (quoting *CSX Transp., Inc.*, Fin. Dkt. No. 34662, 2005 WL 1024490, at *2–3 (S.T.B. May 3, 2005)). Second, it preempts state and local regulation of "matters

4

directly regulated by the [STB]—such as the construction, operation, and *abandonment* of rail lines." *Id.* (emphasis added). And lastly, "[f]or state or local actions that are not facially preempted, the section 10501(b) preemption analysis requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation." *Id.* With respect to this last category, Section 10501(b) preempts state statutes, regulations, or judicial remedies "that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *New York Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007) (quoting *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001)).

Based on the text of Section 10501(b) and applying these precedents, Plaintiffs' Act 135 action is preempted. There is no dispute that the Property in question, a former station, was a "facility" used for rail transportation on the 9th Street Branch. *See* 49 U.S.C. § 10501(b)(2) (providing exclusive STB jurisdiction over the "abandonment . . . of . . . facilities"); 49 U.S.C. § 10102(9) (defining the "transportation" that the STB has jurisdiction over to include any "property, facility . . . or equipment of any kind related to the movement of passengers or property, or both, by rail"). And Plaintiffs' action argues that the Property meets the necessary conditions of "blight and abandonment" necessary to appoint a conservator under Act 135, which is formally titled the "Abandoned and Blighted Property Conservator Act." (*See* Pls' Compl. at ¶ 46); *see also* 68 Pa. Stat. §§ 1101 (providing the title of Act 135), 1102 (declaring that the purpose of Act 135 is to "provid[e] a mechanism to transform abandoned and blighted

5

buildings into productive reuse"). Therefore, Plaintiffs' action concerns a "matter[] directly regulated" by the STB: the abandonment of a rail line. *See City of Ozark*, 843 F.3d at 1171. Plaintiffs, however, make several arguments as to why their action is not preempted. For the reasons discussed below, those arguments are unavailing.

B. **Reading and the Property's Lack of Use**

Plaintiffs primarily argue that Section 10501(b) does not apply to their action and the STB does not have jurisdiction over the property because Reading is not a railroad and the property has not been used for rail operations since the mid 1980s.[3] They maintain that application of Act 135 to the property would have no impact on rail transportation. *See New York Susquehanna*, 500 F.3d at 252 (Section 10501(b) does not preempt laws "having a more remote or incidental effect on rail transportation"). They argue that "the Property is nothing more than a piece of real estate." (Mot. to Remand at 23.)

However, Plaintiffs' argument confuses two distinct categories of laws that Section 10501(b) preempts. On one hand, Section 10501(b) preempts state and local regulation of "matters directly regulated by the [STB]—such as the construction, operation, and *abandonment* of rail lines." *City of Ozark*, 843 F.3d at 1171 (emphasis added). On the other hand, "[f]or state or local actions that are *not facially preempted*," courts engage in a factual assessment to determine whether those actions "would have the effect of preventing or unreasonably interfering with railroad transportation." *Id.* (emphasis added). Because Plaintiffs' Act 135 action directly relates to the abandonment

---

[3] As discussed *supra*, SEPTA utilized electrical equipment on the branch for its train operations until 2010.

6

of part of a rail line, we need not engage in this factual assessment. It does not matter that Plaintiffs' action would not affect any active rail transportation at all. Under Section 10501(b), the STB's jurisdiction over the abandonment of facilities related to rail transportation "is exclusive" and state remedies that concern the same are preempted. 49 U.S.C. § 10501(b). *See also Cnty. of Dutchess v. CSX Transp., Inc.*, No. 09-5606, 2009 WL 2913684 (S.D.N.Y. Sept. 10, 2009) (holding that a state action to condemn approximately five acres of railroad right-of way was preempted by Section 10501(b) even though plaintiff argued that the right-of-way had already been abandoned in practice due to lack of use); *Richmond Waterfront Indus. Park, LLC v. Philadelphia Belt Line R.R. Co.*, No. 220302872, 2023 WL 3337301 (C.P. Phila. Mar. 01, 2023) (holding that a quiet title action seeking adverse possession of a railroad right-of-way in Philadelphia was preempted by Section 10501(b) even though the tracks on the right-of-way were in a state of disrepair, unusable, and did not connect to a terminal).

 Nor does it matter that Reading is an entertainment company, not a railroad. As Section 10501(b) declares, "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). The remedy provided for abandonment under the ICCTA comes in 49 U.S.C. § 10903. That section provides that "a rail carrier providing transportation subject to the jurisdiction of the [STB] . . . who intends to . . . abandon any part of its railroad lines . . . must file an application relating thereto with the [STB]." 49 U.S.C. § 10903(a)(1). A "rail carrier," in turn, is defined as "a person providing common carrier railroad transportation for compensation, but does not include street, suburban, or interurban electric railways not operated as part of the general system

of rail transportation." 49 U.S.C. § 10102(5).  Reading, which runs movie theatres, clearly does not meet this definition.  Therefore, because on its face the remedy provided by the ICCTA for abandonment does not apply to Reading, it might be presumed that the preemption provision likewise does not apply to Plaintiffs' action against Reading.

However, two points resist this conclusion.  First, while Section 10501(b)(1) provides the STB with exclusive jurisdiction over "transportation *by rail carriers*" (emphasis added), Section 10501(b)(2) simply provides the STB exclusive jurisdiction over "the . . . abandonment . . . of . . . facilities," but does not mention "rail carriers." 49 U.S.C. § 10501(b).  Accordingly, the ICCTA does not on its face restrict the STB's jurisdiction, and therefore the scope the of the preemption provision, to the abandonment of rail facilities by *rail carriers*.  Second, it is well established that someone other than a rail carrier may apply to the STB to have a rail line declared abandoned.  *See Howard v. Surface Transp. Bd.*, 389 F.3d 259, 261 (1st Cir. 2004) (citing *Consolidated Rail Corp. v. I.C.C.*, 29 F.3d 706, 708–09 (D.C. Cir. 1994)).  Therefore, an abandonment remedy is available to Reading (and to Plaintiffs), and Section 10501(b) still preempts Plaintiffs' Act 135 action.

      C.      **The Conrail Abandonment**

Plaintiffs also argue that, even if Section 10501(b) would otherwise preempt their Act 135 action, the STB no longer has jurisdiction over the Property.  Specifically, they point to a 1983 petition by Conrail to the ICC for "approval of the abandonment of its operation of" the 9th Street Branch, which the ICC approved.[4]  (*See* Pls' Memo, Ex. 3 at

---

[4] The ICCTA provided that ICC precedent applies to the STB.  *Bhd. of R.R. Signalmen*, 638 F.3d at 809 n.1.

¶ 4, Ex. 4.)  According to Plaintiffs, because the STB/ICC has already approved the abandonment of the 9th Street Branch, it no longer has jurisdiction over the Property and their Act 135 action is therefore not preempted.  (Pls' Memo. at 17–18 (citing *Arnold v. United States*, 137 Fed. Cl. 524, 551 (2018) ("If the STB approves a standard abandonment application or grants an exemption and the railroad ceases operation, the STB relinquishes jurisdiction over the abandoned railroad right-of-way."); *Capreal, Inc. v. United States*, 99 Fed. Cl. 133, 135 (2011) ("When a railroad abandons a line through [a designated procedure with the STB], federal regulatory jurisdiction ends and state property law then controls the disposition of the right-of-way.")).)

However, as Reading points out, Conrail's abandonment of its operation of the 9th Street Branch is inapplicable to the STB's jurisdiction over the line today.  Conrail's abandonment application was brought pursuant to the Regional Rail Reorganization Act of 1973 ("3R Act"), 45 U.S.C. § 701 *et seq.* (Pls' Memo, Ex. 3 at ¶ 3, Ex. 4.)  The 3R Act was enacted "[i]n response to a series of rail bankruptcies [including Reading's] that threatened the viability of intercity rail travel" in the northeast.  *Nat'l R.R. Passenger Corp. v. Se. Pennsylvania Transp. Auth.*, 56 F.4th 129, 131 (D.C. Cir. 2022).  As part of the 3R Act, "Congress created Conrail, a private, for-profit railroad company charged with providing rail service on some of the defunct companies' lines."  *Id.*  Under Section 308(c) of the 3R Act, Conrail had until November 1, 1985, to "file with the [ICC] a notice of insufficient revenues for any line which is part of the system of [Conrail]."[5] 45 U.S.C. § 748(c)(1).  "At any time after the 90-day period beginning with the filing of a

---

[5] The 3R Act refers to Conrail, or the Consolidated Rail Corporation, as "the Corporation." 45 U.S.C. § 702(5).

notice of insufficient revenues for a line, [Conrail could] file an application for abandonment for such line." 45 U.S.C. § 748(c)(2). That is exactly what Conrail did with respect to the 9th Street Branch. (*See* Pls' Memo, Ex. 4.)

Ultimately, Conrail's abandonment was consummated under a specific regime wholly distinct from the more standard procedures outlined in ICCTA. Its abandonment application specifically acknowledged that it did not own the line and that its application "relates only to Conrail's operation of" the 9th Street Branch. (Pls' Memo, Ex. 3 at ¶ 4.) Conrail only had an easement over the line. (Mot. to Remand at 14–15; Defs' Resp. at 12, 14–15.) Conrail's abandonment simply does not affect the STB's current jurisdiction over the 9th Street Branch and the rights of its owner, Reading.

**D.      SEPTA's Use of the Property**

Finally, Plaintiffs maintain that "[e]ven had Conrail not abandoned the Property, the STB still would not have jurisdiction" because "[a]t the time of Conrail's application, the [9th Street Branch] was owned by SEPTA," (Mot. to Remand at 22), "[t]he last rail to run on the tracks at the Property was owned by [SEPTA]," and "[t]he STB has no jurisdiction over public transportation provided by a local governmental authority such as SEPTA's commuter rail system," (Pls' Memo at 17). *See also* 49 U.S.C. § 10501(c) (providing that, generally, the STB does not have jurisdiction over "public transportation provided by a local government authority"). However, as mentioned *supra*, SEPTA never owned a fee interest in the 9th Street Branch; rather, it simply maintained an easement in a "traction power substation at Callowhill Street" and overhead transmission wires along the line. (Defs' Resp., Ex. C at B-13.) Notwithstanding SEPTA's past operations on the 9th Street Branch, it does not currently maintain any operations on the

10

Branch or even utilize its now-defunct electrical equipment, to which it relinquished its rights in 2010. (*See* Defs' Resp. at 17–18.) Even if SEPTA were still using the facilities on the Branch, the STB would nonetheless maintain jurisdiction over the line, as it is owned by Reading, not SEPTA, and therefore does not fall under the public transportation exception of the ICCTA. *See Union Pac. R. Co. v. Chicago Transit Auth.*, No. 07 C 229, 2007 WL 1202417, at *3 (N.D. Ill. Apr. 20, 2007) (holding that the STB maintained exclusive jurisdiction over track which the Chicago Transit Authority leased from Union Pacific for its commuter rail service).[6] Therefore, SEPTA's use of the Branch does not affect the STB's jurisdiction.

### E. Plaintiffs' Way Forward

For the reasons discussed, Plaintiffs' Act 135 action is preempted by Section 10501(b). This does not mean that they are not without a remedy, however. Plaintiffs may file an "adverse abandonment" application with the STB to have the 9th Street Branch declared abandoned. *See Howard*, 389 F.3d at 261. If and when the STB approves this abandonment, Plaintiffs may again file their Act 135 action, whether in state or federal court. *See Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 261 (3d Cir. 2001) ("Unless the STB attaches post-abandonment conditions to a certificate of abandonment or exemption . . . the authorization of abandonment ends the Board's regulatory mission and its jurisdiction."); *City of S. Bend, IN v. Surface Transp. Bd.*, 566 F.3d 1166, 1168 (D.C. Cir. 2009)

---

[6] Under the version of the ICCTA referred to by the court in *Chicago Transit Auth.*, the term "mass transportation" was used in place of the current term, "public transportation." *See* Pub. L. No. 114-94, § 3030(g)(2), 129 Stat 1312, 1497 (2015) (striking "mass transportation" and inserting "public transportation").

("Abandonment frees subservient landowners to exercise reversionary rights in, and local governments to condemn, the railroad's right-of-way.")

While Plaintiffs' position that they should not need to obtain this kind of authorization or approval from the STB with regard to a rail line that has long since been used for rail transportation is understandable, requiring them to do so is necessary to remain faithful to the Congress's intent. "The exclusive and plenary nature of the [STB's] authority to rule on carriers' decisions to abandon lines is critical to the congressional scheme, which contemplates comprehensive administrative regulation of interstate commerce." *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321 (1981). Section 10501(b)'s preemption provision was designed to "prevent a confusing situation where legal actions are instituted under a variety of laws," such as Act 135, resulting in "similar claims being treated differently from one state to another and would likely encourage forum shopping." *S. Dakota ex rel. S. Dakota R.R. Auth. v. Burlington N. & Santa Fe Ry. Co.*, 280 F. Supp. 2d 919, 933 (D.S.D. 2003) (quoting S. REP. No. 104-176, at 57 (1995)). "In order to avoid this, exclusive remedies are needed to provide a consistent method of resolving disputes." *Id.* Ultimately, Plaintiffs are "impermissibly attempting to subject to state law property that Congress specifically put out of reach" until the STB approves its abandonment. *Wisconsin Cent. Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009, 1013–14 (W.D. Wis. 2000).

IV. **CONCLUSION**

For the foregoing reasons, Reading is entitled to judgement as a matter of law and its Converted Motion to Dismiss is granted. Plaintiffs' action is dismissed without prejudice. They

may refile their action in this Court or the Court of Common Pleas of Philadelphia County if and when the STB approves the abandonment of the 9th Street Branch.

An appropriate order follows.

                                                          **BY THE COURT:**

                                           *_/s/ R. Barclay Surrick_*
                                           **R. Barclay Surrick, J.**